# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**THE ESTATE OF MABLE DEAN BRADLEY, BY
AND THROUGH GLORIA SAMPLE, ADMINISTRATRIX
OF THE ESTATE OF MABLE DEAN BRADLEY, as
Assignee of claims held by Grancare, Inc., Marine Health
Care, Inc., Boyd P. Gentry, George Morgan, M. Scott
Athans, Robin C. Skelton, and Eleta Jo Grimmett**        **PLAINTIFF**

**VERSUS**        **CIVIL ACTION NO. 4:08CV15-P-S**

**ROYAL SURPLUS LINES INSURANCE COMPANY
and LUMBERMEN'S MUTUAL CASUALTY
COMPANY**        **DEFENDANTS**

## <u>MEMORANDUM OPINION</u>[1]

This cause is before the Court on the plaintiff's Motion for Partial Summary Judgment [37],

defendant Lumbermen's Mutual Casualty Company's (hereafter "Lumbermen's") Cross Motion for

Summary Judgment [52] and defendant Royal Surplus Lines Insurance Company's (hereafter "Royal

Surplus") Motion for Summary Judgment [55].  The Court, having reviewed the motions, the

responses, the briefs of the parties, the authorities cited and being otherwise fully advised in the

premises, finds as follows, to-wit:

---

[1] In an Order entered September 30, 2009, this Court initially denied the parties' motions based on its uncertainty as to whether the Lexington policy was an occurrence policy versus a claims made policy.  Since then,  the Court has devoted substantial time and resources to a review of the applicable case law and the voluminous record–including the trial transcript from the underlying state court action.  That review has led the Court to conclude that neither the Royal excess policy nor the Lumbermen's excess policy afford coverage for the <u>Bradley</u> suit.

## FACTUAL BACKGROUND

Mable Dean Bradley resided at the Indianola Health and Rehabilitation Center from February 7, 2000 through May 17, 2002. Ms. Bradley died at South Sunflower County Hospital on May 18, 2002. Her estate brought suit against Mariner Health Care and several other defendants (hereafter "the Mariner defendants") in the Circuit Court of Sunflower County on December 11, 2002. The complaint in the Bradley suit sought recovery based on state law claims of negligence, fraud, breach of fiduciary duty, statutory survival and wrongful death arising out of Bradley's residence at the Indianola nursing home. The trial in the Bradley suit took place from May 16, 2006 through May 26, 2006. The jury awarded $1.5 million in compensatory damages and $10.5 million in punitive damages. Circuit Court Judge Margaret Carey-McCray entered a final judgment in the case on August 30, 2006. The Mariner defendants wanted to pursue an appeal. Although Mariner's first layer excess insurer, Lexington Insurance Company (hereafter "Lexington"), agreed to post a portion of the necessary supersedeas bond, Mariner's second (Royal Surplus) and third layer (Lumbermen's) excess insurers did not.[2] Subsequently, the Mariner defendants and Lexington Insurance Company entered into a settlement with the Bradley estate. The settlement agreement

> extinguish[ed] any and all claims relating to and including, without limitation, any injury that may have occurred during or on account of MABLE DEAN BRADLEY's residency/treatment at INDIANOLA HEALTH AND REHABILITATION CENTER, prior to the date of this agreement, also including claims for damages,

---

[2] Plaintiff's Statement of Undisputed Facts actually reads as follows:

29. Royal refused to post any portion of the appellate bond until after the Bradley suit was settled.

30. Lumbermens refused to post any portion of the appellate bond.

Plaintiff's Motion for Partial Summary Judgment and Statement of Undisputed Facts at p. 6.

costs or attorneys' fees, whether arising under tort, contract or other theories, or any federal, state, local or other law" in exchange for $10.5 million.

Plaintiff's Motion for Partial Summary Judgment and Statement of Undisputed Facts at p. 6. Lexington and the Mariner defendants paid a total of $2.3 million toward the settlement of the Bradley suit. The $2.3 million included Mariner's self-insured retention and Lexington's policy limits under its Policy No. 7058900 for the policy period March 31, 1999 to March 31, 2000. Royal Surplus and Lumbermen's have paid nothing. Pursuant to the confidential settlement agreement, the Mariner defendants assigned any and all claims the Mariner defendants might have against Royal Surplus and Lumbermen's to the Bradley estate.

Thereafter, on February 4, 2008, the Bradley estate filed the instant bad faith action against Royal Surplus and Lumbermen's. The defendants answered, denying the plaintiff's allegations and raising a number of affirmative defenses. The parties have since filed cross-motions for partial summary judgment. Plaintiff's motion seeks a declaration that Royal Policy No. KHN 013116 (March 31, 1999 - March 31, 2000)[3] and Lumbermens Policy No. 9SR 114 916-00 (March 31, 1998 - March 31, 2001)[4] provided excess coverage to Lexington Policy No. 7058900 (July 31, 1999 - July 31, 2000)[5]; and that the above-referenced policies required the insurers to indemnify and defend the

---

[3] The plaintiff refers to Royal Surplus Policy No. KHN 013116 with policy limits of $10 million as "Royal One." Royal Surplus also provided excess coverage during the policy period March 31, 2000 to March 31, 2001 with identical limits. The Royal Surplus policies were second layer excess policies.

[4] The plaintiff refers to Lumbermen's Policy No. 9SR 114 916-00 with policy limits of $15 million as "Lumbermen's One." The Lumbermen's policy was a third layer excess policy.

[5] The plaintiff refers to Lexington Policy No. 7058900 with policy limits of $2 million as "Lexington One." Lexington also provided general and professional liability coverage during the policy periods March 31, 2000 to March 31, 2001 and March 31, 2001 to March 31, 2002 pursuant to policy numbers 3539821 and 6801160 with policy limits of $2 million and $5 million respectively. Plaintiff refers to the latter policies as "Lexington Two" and "Lexington Three."

Mariner defendants for the Final Judgment in the <u>Bradley</u> suit.[6]  Royal's motion, by contrast, seeks

a declaration that its policy did <u>not</u> require Royal to either defend or indemnify Mariner with respect

to the suit and that, therefore, the Estate has no claim against it.  Finally, Lumbermen's asks for a

similar declaration with regard to its policy.  The motions have been fully briefed and the Court is

ready to rule.

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where "the

pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits,

if any, show that there is no genuine dispute as to any material fact and that the moving party is

entitled to judgment as a matter of law.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322, 91

L.Ed.2d 265, 106 S. Ct. 2548 (1986).  The existence of a material question of fact is itself a question

of law that the district court is bound to consider before granting summary judgment.  <u>John v. State

of La. (Bd. Of T. for State C. & U.</u>, 757 F.2d 698, 712 (5th Cir. 1985).

A judge's function at the summary judgment stage is not himself to weigh the evidence and

determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There

is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to

return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 91 L.Ed.2d

---

The Lexington policies were first layer excess policies (the Mariner defendants were self-insured
for $1 million).

[6]  The Estate of Mable Dean Bradley, by and through Gloria Sample, Administratrix of
the Estate v. Mariner Healthcare, Inc., Grancare, Inc., Boyd P. Gentry, George Morgan, Robin C.
Skelton, and Eleta Jo Grimmett, in the Circuit Court of Sunflower County, Mississippi Case No.
2002-0696-CI.

202, 106 S. Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis, 799 F.2d 218, 222 (5th Cir. 1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." Id. "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. Phillips Oil Company, v. OKC Corporation, 812 F.2d 265, 272 95th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Topalian v. Ehrman, 954 F.2d 1125, 1138 (5th Cir. 1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. McPherson v. Rankin, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. Union Planters Nat. Leasing v. Woods, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. Topalian, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." John, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground

that [plaintiff] failed to respond to defendants' motion for summary judgment, " even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  Id. at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  Ferguson v. National Broadcasting Co., Inc., 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  In Re Municipal Bond Reporting Antitrust Lit., 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda.  The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed. R. Civ. P.  See also Union Planters Nat. Leasing v. Woods, 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court, (Topalian, 954 F.2d at 1137), "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention–the court must consider both before granting a summary judgment."  John, 757 F.2d at 712, quoting Keiser v. Coliseum Properties, Inc., 614 F.2d 406, 410 (5th Cir. 1980).

LEGAL ANALYSIS

I.      Choice of Law/Application of Erie

The parties are in agreement that Mississippi law applies to the issues before the Court.  In a diversity case where state law provides the rules of decision, the federal courts are to apply the substantive law of that state.  Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d

395, 398 (5th Cir. 2008).  Here, the law of Mississippi regarding coverage under the excess policies applies.  If no directly applicable law exists, then the federal courts are to make their best guess as to what the highest court of the State, in this case Mississippi, would do.  This is called an "Erie guess."  Lindley v. Hamilton, 883 F.2d 360, 362-3 (5th Cir. 1989).

II.      Controlling Standard

Proper resolution of questions regarding an insurer's duty to defend versus its duty to indemnify require the use of differing standards.  Simply put, the duty to defend is generally "broader than the insure[r]'s duty to indemnify under its policy of insurance."  Cullup v. Sphere Drake Ins. Co., 129 F. Supp.2d 981, 982 (S.D. Miss. 2001).  For that reason, "[t]he duty of an insurance provider to defend its insured depends upon the language of the policy."  Essex Insurance Co. v. Greenville Convalescent Home Inc., 236 Fed. Appx. 49, 51 (5th Cir. 2007).  "'The traditional test' for whether an insurer has a duty to defend under the policy language 'is that the obligation of a liability insurer is to be determined by the allegations of the complaint or declaration [in the underlying action]'".  Delta Pride Catfish, Inc. v. Home Ins. Co., 697 So.2d 400, 403 (Miss. 1997) (quoting from State Farm Mut. Auto. Ins. Co. v. Taylor, 233 So.2d 805, 808 (Miss. 1970)).  By contrast, "the duty to indemnify turns **'upon the actual facts that underlie the cause of action and result in liability**.'"  Essex Ins. Co., 236 Fed. Appx. at 52 (emphasis in original)(additional citations omitted).  "Any associated legal questions regarding coverage will be informed by the results of the trial . . . ."  Id.  Accordingly, whether an insurer owes a duty of indemnity is dependent on the proof put forward at the trial of the underlying suit.[7]

---

[7]  The burden of proving coverage rests at all times with the insured.  Architex Ass'n., Inc. v. Scottsdale Ins. Co., 27 So.3d 1148, 1157 (Miss. 2010).

III.    Policy Analysis

        A.    Pertinent Policy Provisions

The most logical place to begin analysis is with the pertinent policy language.  Lexington
Insurance Company issued Mariner a Stand Alone Excess Liability Policy.  The insuring agreement
extended coverage based on the following language:

        I.    <u>COVERAGE</u>

              We will pay on behalf of the **Insured** that portion of the **ultimate net loss** in
              excess of the Self-Insured Retention as determined in Section III.C. of this
              policy which the **Insured** shall become legally obligated to pay as
              compensatory damages (including fines, penalties, punitive or exemplary
              damages if permitted by law) because of **personal injury, property damage
              or advertising injury** caused by an **occurrence** to which this insurance
              applies, due to:

              A.    liability imposed upon the **Insured** by law, or

              B.    liability for negligent acts of others assumed by the **Insured** under
                    any written contract entered into prior to the time of **occurrence**.

Exhibit D to Memorandum of Authorities in Support of Defendant Royal's Motion for Final
Summary Judgment at p. 3 (emphasis in original).  As to defense obligations, the policy further
provided:

        II.    <u>DEFENSE</u>

              A.    After the limit of the Self-Insured Retention is exhausted through
                    payment of damages, legal expenses and defense expenses for **claims**
                    that would otherwise be covered under this policy:

                    1.    We will defend any suit(s) against the **Insured** alleging
                          liability insured under the provisions of this policy and
                          seeking recovery for damages on account thereof, even if
                          such suit is groundless, false or fraudulent, but we will have
                          the right to make such investigation and negotiation and
                          settlement of any claim(s) or suit(s) as may be deemed
                          expedient by us.

2.    We will pay:

. . .

(b)    all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds:

. . . .

B.    We will pay the amounts incurred under II.A. above, but any such payments shall:

1.    serve to reduce the Limits of Liability of this policy as stated in the Declarations, and

2.    be subject to the **Insured's** retention of an amount equal to that stated in the Declarations as Self-Insured Retention. The Self-Insured Retention applies separately to each and every **occurrence**.

C.    In all other instances except II.A. above, we shall not be called upon to assume charge of the investigation, settlement or defense of any **claim** or suit brought or proceeding instituted against the **Insured** but shall have the right and be given the opportunity to be associated in the defense and trial of any such **claim**, suit or proceeding relative to any **occurrence** which, in our opinion, may create liability for us under the terms of this policy. If we avail ourselves of such right and opportunity, we shall do so at our own expense.

Id. at p. 3-4 (emphasis in original). Finally, the policy read as follows with regard to limits of liability:

III.    LIMITS OF LIABILITY

A.    Aggregate Limits of Liability

This policy is subject to the aggregate limits of liability as stated in Item 3 of the Declarations.

1.    Total Policy Aggregate Limit. The Total Policy Aggregate Limit is the maximum amount we will pay under this policy for the total of all **occurrences** and all **medical incidents** during the policy period.

2.      Aggregate Limit Per Location.  Subject to the Total Policy Aggregate Limit, the Aggregate Limit Per Location is the maximum amount we will pay under this policy for the total of all **occurrences** and all **medical incidents** at any one insured location during the policy period.

B.      Occurrence Limit/Medical Incident Limit of Liability

Subject to the above provisions respecting aggregates, the Limit of Liability stated in the Declarations as Per Occurrence/Per Medical Incident is the total limit of our liability for **ultimate net loss**, including damages for loss of services or loss of consortium, because of all **personal injury, property damage, advertising injury**, and professional liability, alone or in combination, sustained by one or more persons or organizations as a result of any one **occurrence** and one **medical incident**.

C.      Self Insured Retention

1.      Coverage as is afforded by this policy applies only to any amount(s) in excess of the amount stated in Item 4 of the Declarations, Self Insured Retention.

2.      The Self Insured Retention applies whether or not the first Named Insured maintains applicable underlying insurance.

3.      The Self Insured Retention shall consist of payments for damages and for all legal costs and all defense expenses incurred in any **claim** or **claims**, until such time as the Self insured retention is exhausted by the payment of damages and legal costs and defense expenses.

4.      The Self Insured Retention will only be reduced or exhausted by payment(s) of **claim(s)** that would be insured by this policy.

D.      Limit Exhaustion

This policy shall cease to apply after the applicable aggregate limits of liability have been exhausted by payment of defense costs and/or judgments and/or settlements.

Id. at p. 4-5 (emphasis in original).

An endorsement extended coverage for medical professional liability. It provided as follows:

In consideration of the premium charged it is hereby understood and agreed that the policy is extended to provide the following:

I.      COVERAGE - MEDICAL PROFESSIONAL LIABILITY

      1.      The Company will pay on behalf of the Insured that portion of **ultimate net loss** in excess of the Self-Insured Retention which the **Insured** shall become legally obligated to pay as **Damages** which occur during the policy period, resulting from a **medical incident** arising out of the following professional services provided by the **Insured** to any person at any pharmacy or facility owned, managed or operated by the Named Insured in Item # 1 of the Declarations:

            a)      medical, surgical, dental or nursing treatment to a **patient**, including the furnishing of food or beverage in connection therewith;

            b)      furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances if the **personal injury** occurs after the **Insured** has relinquished possession thereof to others;

          . . .

      Any such rendering of or failure to render the above described professional services, together with all related acts or omissions in the furnishing of such services to any one **patient** resulting in a **claim** shall be considered as arising out of one **medical incident**.

Id. at p. 23 (emphasis in original). The definitions section of the endorsement further provides:

III.     ADDITIONAL DEFINITIONS

      When used in reference to this Coverage:

      . . .

      **Medical incident** means any act or omission:

            a)      in the furnishing of professional, medical or dental services by the **Insured**, an employee of the **Insured** or by any person acting under the personal direction, control or supervision of the **Insured**; . . . .

      Any such act or omission together with all related acts or omissions in the

furnishing of such services to any one person shall be considered one **medical incident**.

Id. at p. 24.  The Medical Professional Liability endorsement also provides:

V.      SELF INSURED RETENTION

This coverage applies only to amounts in excess of that stated in Item 4 of the Declarations, Self Insured Retention.

VI.     POLICY CONDITIONS

All conditions in this policy not inconsistent with the provisions of this coverage shall apply to the coverage provided under this coverage endorsement.

Nothing herein contained shall be held to waive, vary, alter or extend any condition or provision of the policy other than as above stated.

Id. (emphasis in original).

The Royal Surplus policy provided a layer of coverage in the amount of $10,000,000 excess

of the Lexington policy.  The terms of the Royal Surplus policy provide:

I.      INSURING AGREEMENT

1.      We will pay on behalf of the insured those sums in excess of the "retained limit", which the insured becomes legally obligated to pay as damages to which this insurance applies because of:
(a) "Bodily injury" or "property damage" which occurs during the policy period and is caused by an "occurrence";

. . .

2.      We will have the right and duty to defend any "suit" seeking those damages when:

(a) The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements; or
(b) No other valid and collectible insurance is available to the insured for damages covered by this policy.

Exhibit F to Memorandum of Authorities in Support of Defendant Royal's Motion for Final Summary Judgment at p. 3.

The Royal Surplus policy also included the following endorsement:

<u>PROFESSIONAL LIABILITY LIMITATION</u>

This endorsement modifies insurance provided under the following:

Commercial Catastrophe Liability Insurance ("Big Shield" Policy)

With respect to "Professional liability" arising out of any Insured's activities as a(n) Nursing Facilities

this policy is limited to the coverage provided in the Underlying Insurance".

If coverage is not provided by "Underlying Insurance", coverage is excluded from this policy.

"Professional Liability", as used in this endorsement, means liability arising out of any Insured's profession as stated above and caused by the rendering or failure to render "Professional Services" for others; including "Professional Service" of any employee of any insured or of any other person for whom any Insured is legally liable.

<u>Id.</u> at p. 17.

The Lumbermen's policy provided in pertinent part:

SECTION 1 - INSURING AGREEMENTS

A.      COVERAGE

      1.      We will pay on behalf of the "Insured" that part of "Loss" covered by this insurance in excess of the limits of liability of the "Underlying Insurance" as set forth in the Schedule of Underlying Insurance but only up to an amount not exceeding our Limits of Liability as set forth in Item 4. of the Declarataions, provided the "Insured Event" takes place during our "Policy Period."

      2.      Except when stated to apply otherwise, this policy is subject to all of the terms, conditions, insuring agreements, definitions, and exclusions (hereinafter called "provisions") of the "Designated

Underlying Policy", but in no event shall this policy be subject to the provisions of the "Designated Underlying Policy" with respect to the premium, the "Policy Period", the renewal or extension agreement (if any), the amount or limits of liability, or any other provision of the "Designated Underlying Policy" that may be inconsistent with this policy.

3.    Notwithstanding anything to the contrary contained in this policy, if the "Designated Underlying Policy" does not cover "Loss" for any reason other than exhaustion of an aggregate limit of liability by payment of claims, then we will not cover such "Loss."

Exhibit A to Defendant Lumbermen's Memorandum in Support of its Response to Plaintiff's Motion for Partial Summary Judgment at p. 3. As regards any duty to defend, the Lumbermen's policy further provided:

SECTION II - DEFENSE AND SUPPLEMENTARY PAYMENTS

A.    We will not be obligated to assume charge of the investigation, settlement or defense of any claims made, suits brought or proceedings instituted against the "Insured." However, we will have the right and shall be given the opportunity to participate with the "Insured" or the underlying insurers, or both, in the investigation, settlement, defense and trial of any claims, suits or proceedings relative to any "Insured Events" which appear reasonably likely to create liability on our part under the terms of this policy. We will not defend any suit after we have exhausted our applicable Limit of Liability as set forth in Item 4. of the Declarations:

B.    When defense and supplementary payments of:

1.    Any "Underlying Insurance" reduce the limits of liability provided by such "Underlying Insurance," then any such expense payments made under this policy will reduce our Limits of Liability; or

2.    None of the "Underlying Insurance" reduce the limits of liability provided by such "Underlying Insurance," then any such expense payments made under this policy will not reduce our Limits of Liability.

C.    We will only pay the following expenses:

1.    If the "Insured" becomes legally liable for interest that accrues on a

14

judgment after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our applicable Limits of Liability, then we will pay the interest on the part of the judgment to which this policy applies.

2.      Expenses incurred directly by us and at our sole discretion.

3.      Prejudgment interest awarded against the "Insured" on that part of the judgment we pay. However, if we make an offer to pay our applicable Limits of Liability prior to judgment, we will not pay any prejudgment interest that accrues after our offer.

Id. at p. 4-5.

B.      The Parties' Respective Positions

The Bradley estate hinges its argument on its belief that the Royal Surplus policy followed form to the Lexington policy in every particular. It therefore posits that Royal Surplus' duty to defend was triggered once it was clear that the judgment in the Bradley suit exceeded the limits of the underlying insurance. It likewise contends that Royal Surplus was obligated to fund Mariner's appea.l bond under substantially the same logic. Plaintiffs also urge the Court to find that Royal Surplus was obliged to indemnify the Mariner defendants for the judgment and settlement in the Bradley suit because under the terms of the Lexington policy's professional liability endorsement the entirety of Mable Bradley's residency in the nursing home from February 2000 through May 2002 was to be considered a single "medical incident;" the Mariner defendants were, therefore, free to elect any of the Lexington policies under which to submit their claim.[8]

Royal Surplus takes the position that it had no duty to defend Mariner in the Bradley lawsuit; moreover, because it had no duty to defend, it was in no way responsible for funding a supersedeas

---

[8] The Bradley estate makes a similar argument with respect to Lumbermen's duty to defend and to indemnify.

bond in order to forestall collection of the judgment. Finally, Royal Surplus likewise maintains that it had no obligation to indemnify Mariner for the judgment in the underlying suit because the injuries suffered by Mable Bradley and for which the jury awarded damages did not occur during Royal's excess policy period.[9]

Lumbermen's asserts that under the terms of its policy it had no duty to defend the Mariner defendants; if it did, however, that duty could only be triggered by exhaustion of all applicable underlying insurance–a condition never satisfied. Lumbermen's also maintains that the terms of its policy imposed no obligation to assist the Mariner defendants in posting an appeal bond. With regard to indemnification, Lumbermen's asserts it was under no duty to indemnify the Mariner defendants because the loss fell outside the period of coverage and it did not reach the attachment point of its policy.[10]

---

[9] Royal Surplus also argued that Mariner's bankruptcy reorganization plan precluded coverage under Royal Surplus' policy for at least two reasons. The Court finds it unnecessary to address these particular argument in order to resolve the coverage issue.

[10] Lumbermen's also argue that Mariner's bankruptcy reorganization plan precluded coverage under its policy. Again, it is unnecessary to address these arguments to resolve the coverage dispute.

C.      Contract Construction

Mississippi courts apply general rules of contract construction in interpreting an insurance

contract.  U.S. Fidelity & Guarantee Co. v. Omnibank, 812 So.2d 196, 198 (Miss. 2002).

Accordingly, the Court will undertake its analysis while bearing the following principles in mind:

> First, where an insurance policy is plain and unambiguous, a court must construe that
> instrument, like other contracts, exactly as written. Second, it reads the policy as a
> whole, thereby giving effect to all provisions. Third, it must read an insurance policy
> more strongly against the party drafting the policy and most favorably to the
> policyholder. Fourth, where it deems the terms of an insurance policy ambiguous or
> doubtful, it must interpret them most favorably to the insured and against the insurer.
> Fifth, when an insurance policy is subject to two equally reasonable interpretations,
> a court must adopt the one giving the greater indemnity to the insured. Sixth, where
> it discerns no practical difficulty in making the language of an insurance policy free
> from doubt, it must read any doubtful provision against the insurer. Seventh, it must
> interpret terms of insurance policies, particularly exclusion clauses, favorably to the
> insured wherever reasonably possible. Finally, although ambiguities of an insurance
> policy are construed against the insurer, a court must refrain from altering or
> changing a policy where terms are unambiguous, despite resulting hardship on the
> insured.

Centennial Ins. Co. v. Ryder Truck Rental, Inc., 149 F.3d 378, 382-83 (5th Cir. 1998) (citations

omitted).

D.      Examining the Policy Language

        1.      Neither Royal Surplus Nor Lumbermen's Owed Mariner a Defense

Plaintiff's position, as described in section III.B. above, is untenable.  The Court has

examined each of the applicable policies in excruciating detail.  Nothing in the Royal Surplus policy

suggests that it follows form as to all of the terms and conditions in the Lexington policy.  Instead,

only the Professional Liability Limitation endorsement contains a follow form provision.  Reference

to the Lexington policy's Medical Professional Liability Coverage endorsement reveals no reference

to a defense obligation.  Instead, section I. of the endorsement merely describes the scope of

available coverage for medical professional liability–consistent with section I. of the policy proper in describing the scope of coverage for personal injury, property damage and advertising injury. Because the Lexington policy's endorsement included no reference to a duty of defense, two conclusions follow: 1) the terms of the policy proper control Lexington's duty of defense for claims of medical professional liability; and 2) Royal Surplus' defense obligation, if any, must be determined by reference to the terms of the Royal Surplus policy.[11]  As quoted in section III.A. above, the Royal Surplus policy only imposed a duty to defend when: "[t]he applicable limits of the "underlying insurance" and other insurance have been used up in the <u>payment</u> of judgments or settlements . . . ." (emphasis added).  The mere entry of a judgment in excess of the underlying insurance was insufficient to trigger Royal Surplus' duty to defend.  Instead, the duty only arose upon actual payment of judgments or settlements sufficient to exhaust both Mariner's self-insured retention and Lexington's policy limits.  That never occurred prior to the Mariner defendants' settlement with the Bradley estate.  Accordingly, Royal Surplus did not breach its duty to defend with regard to the <u>Bradley</u> suit.

---

[11]  The same is true with regard to any duty on the part of Royal Surplus to provide funds for the Mariner defendants supersedeas bond.  The endorsement did not address the issue; accordingly, the terms of the insurers' respective policies controlled.  While the Lexington policy recognized a duty to pay premiums for appeal bonds, the Royal Surplus policy did not. Moreover, even if section II. of the Royal Surplus policy pertaining to the cost of bonds to release attachments could be construed as a reference to appeal bonds, Royal Surplus only had a duty to pay such sums in connection with suits it defended.  As indicated above, Royal Surplus had no duty to defend the Mariner defendants prior to actual exhaustion of the underlying insurance through payment of judgments and settlements.

By contrast to the Royal Surplus policy, the Lumbermen's policy did contain a general follow forms provision.[12] However, it was tightly drawn as indicated by the quoted language in section III.A. The Lumbermen's policy expressly stated "in no event shall this policy be subject to the provisions of the "Designated Underlying Policy" with respect to . . . any other provisions of the "Designated Underlying Policy" that may be inconsistent with this policy." The terms and conditions of the Lumbermen's policy disavow a duty to defend in no uncertain terms: "We will not be obligated to assume charge of the investigation, settlement or defense of any claims made, suits brought or proceedings instituted against the 'Insured.'" Accordingly, because the terms of the Lumbermen's policy are inconsistent with the terms of the Lexington policy, the Lumbermen's policy did not follow form to the Lexington policy for purposes of determining Lumbermen's defense obligations. Lumbermen's had no duty to defend the Mariner defendants in the <u>Bradley</u> suit.[13]

    2.    Neither Royal Surplus Nor Lumbermen's Owed Mariner Indemnity

The parties understandably devoted enormous attention to the indemnification issue. Plaintiff, in particular, focused its briefing on the language of Lexington's Medical Professional Liability Coverage endorsement and the wording of the complaint in the <u>Bradley</u> suit. The Bradley estate relies on allegations in the complaint to the effect that "[t]he wrongs complained of herein

---

[12] Lumbermen's also took issue with regard to what policy as to which it followed form. It argued that it followed form to a policy issued by Northfield Insurance Company–coverage replaced by the Royal Surplus policy. For purposes of deciding the coverage issue, the Court has accepted the plaintiff's position that the Lumbermen's policy followed form to the Royal Surplus policy, which in turn followed for to the Lexington policy.

[13] Because Lumbermen's had no duty to defend, it likewise could have had no obligation to assist the Mariner defendants in posting an appeal bond.

were of a continuing nature, and occurred throughout [Mable Dean Bradley]'s stay at Defendants' facility" (from February 2000 to May 2002). It likewise points to language in the applicable endorsement which provides that "[a]ny such rendering of or failure to render the above described professional services, together with all related acts or omissions in the furnishing of such services to any one patient resulting in a claim shall be considered as arising out of one medical incident." Based on the foregoing, plaintiff maintains that the complaint triggered each of the three policy periods under Lexington's stand alone excess liability policy. The Bradley estate then cited persuasive authority[14] for the proposition that

> [i]f a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies that would maximize coverage. Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.

American Physicians Ins. Exchange v. Garcia, 876 S.W.2d 842, 855 (Tex. 1994).[15] The Mariner

---

[14] There has at yet been no decision by the Mississippi Supreme Court addressing the Garcia issue. Garcia notwithstanding, the Court finds the persuasive authority cited by defendants more on point. In Royal Ins. Co. v. Caliber One Ind. Co., the Fifth Circuit (applying Texas law) determined that specific acts and omissions caused specific medical injuries to a nursing home resident and, therefore, those specific injuries necessarily determined the applicable policy period. 465 F.3d 614 (5th Cir.)(applying Texas law). Although the Court deems it unnecessary to resolve this unsettled matter of state law, the Court would note its preference for the approach taken in the Caliber One case given the facts presented herein

[15] Garcia relied in part on a decision out of the D.C. Circuit, Keene Corporation v. Insurance Company of North America, 667 F.2d 1034, 1049-50 for the "targeted tender" approach touted by plaintiff in this case. Defendants disagree with this approach and instead endorse horizontal exhaustion of all primary policies across the entire time span of injuries prior to reaching excess coverage. Kajima Constr. Services, Inc. v. St. Paul Fire & Marine Ins. Co., 879 N.E.2d 305, 308-15 (Ill. 2007). Again, it is unnecessary for the Court to resolve this Erie question in order to decide the issues in the case.

defendants, therefore, elected to submit their claim for the Bradley judgment and the subsequent settlement under the Lexington policy's first policy period ("Lexington One") running from March 31, 1999 to March 31, 2000.[16]  Plaintiff now asks this Court to respect the Mariner defendants' decision and to declare that both Royal Surplus and Lumbermen's had a duty to indemnify the Mariner defendants for the judgment in the <u>Bradley</u> suit.

However, plaintiff's argument fails for two reasons.  First, as stated in section II. <u>supra</u>, an insurer's duty to indemnify turns, not on the allegations of the complaint, but on the proof put forward at the trial of the underlying suit.  The Court has carefully examined the transcript from the state court trial.  It is clear that the claims submitted to the jury related exclusively to alleged injuries–e.g., a delay in treatment for a broken femur, a delay in treatment for a urinary tract infection and dehydration–arising from Ms. Bradley's treatment beginning in early April 2002 and ending at the time of her death on May 18, 2002.[17]  In a related vein, Lexington's Medical Professional Liability endorsement limited coverage to: "that portion of **ultimate net loss** in excess of the Self-Insured Retention which the **Insured** shall become legally obligated to pay as **Damages** which occur during the policy period, resulting from a medical incident . . . ."  The unambiguous language of the policy limits indemnity to those damages (resulting from a medical incident) which

_____

[16]  The coverage limits for the policy period included Mariner's $1 million self-insured retention, Lexington's $2 million stand alone excess liability limits, Royal Surplus' $10 million second layer excess liability limits and Lumbermen's $20 million third layer excess liability limits–for a total of $33 million in limits.

[17]  Although the Bradley estate offered a small amount of evidence relevant to the nursing home's general operating procedures prior to April 2002, a review of the record clearly establishes that the evidence in question served primarily as background for the plaintiff's claim. More importantly, the plaintiff did not submit any evidence tending to establish that the "charting issues" identified by plaintiff caused damages to Ms. Bradley during either of the first two of the Lexington policy periods.

occur during the policy period. Because the Royal Surplus and Lumbermen's policies follow form as to the Lexington policy with regard to medical professional liability coverage, the second and third layer excess insurers have a duty to indemnify only for damages which occur during their respective policy periods. With regard to Royal Surplus, those policy periods ran from March 31, 1999 to March 31, 2000 and from March 31, 2000 to March 31, 2001. The Lumbermen's policy period ran from March 31, 1998 to March 31, 2001. Because "the actual facts that under[lay] the cause of action and result[ed] in liability" occurred outside the excess insurers' policy periods, neither Royal Surplus nor Lumbermen's have a duty to indemnify the plaintiff (as assignee of the Mariner defendants) for the judgment in the Bradley suit.

CONCLUSION

Based on the foregoing facts and analysis, the Court finds the plaintiff's Motion for Partial Summary Judgment [37] is not well-taken and should be denied. The Court further finds that defendant Lumbermen's Mutual Casualty Company's Cross Motion for Summary Judgment [52] and defendant Royal Surplus Lines Insurance Company's Motion for Summary Judgment [55] are well-taken and should be granted. Orders will issue accordingly.

This, the 6th day of July, 2010.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE